IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TRUDY SPENCE-PARKER, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 08-3740 (JBS) |
| v. | : | |
| DELAWARE RIVER AND BAY AUTHORITY & JAMES JOHNSON, | : | **OPINION** |
| Defendants. | : | |

APPEARANCES:

Jeffrey P. Resnick, Esq.
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, PC
Fairway Corporate Center
4300 Haddonfield Road
Suite 311
Pennsauken, NJ 08109
     Attorney for Plaintiff Trudy Spence-Parker

William F. Cook, Esq.
William M. Tambussi, Esq.
BROWN & CONNERY
360 Haddon Avenue
Westmont, NJ 08108
     Attorneys for Defendants Delaware River and Bay Authority
     and James Johnson

**SIMANDLE,** District Judge:

I.   **INTRODUCTION**

    This matter is before the Court upon Defendant Delaware

River and Bay Authority's motion to dismiss Plaintiff's Complaint

[Docket Item 4].  Plaintiff's relatively straightforward claims,

premised upon New Jersey statutory and common law, are

complicated by the fact that the Delaware River and Bay Authority

(the "DRBA" or "Authority"), is a bistate Compact Clause entity

that is "not subject to the unilateral control of any one of the States that compose the federal system."  Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 42 (1994).  This case calls upon the Court to consider whether the state laws under which Plaintiff's claims are brought are applicable to the DRBA.  For the reasons set forth below, the Court will grant the DRBA's motion to dismiss Plaintiff's statutory claims but deny its motion to dismiss Plaintiff's common law claims.[1]

## II.  BACKGROUND

### A.  Facts

#### 1.  Plaintiff's Employment at DRBA

Plaintiff Trudy Spence-Parker is a New Jersey resident who was previously employed by the DRBA as the Authority's Chief Human Resources Officer.  (Compl. ¶¶ 1, 6.)  Plaintiff was hired for the Chief Human Resources Officer position on February 24, 2003, and served in that capacity at the DRBA until she tendered her resignation on March 14, 2008.  (Id. at ¶¶ 6, 42.)  As Chief Human Resources Officer, Plaintiff was responsible for "the development, implementation, monitoring, and enforcement of the Authority's human resources policies, procedures and practices and creating and sustaining a work environment that will make the

---

[1]  Defendants appear to have filed this motion to dismiss on behalf of the DRBA alone, not Mr. Johnson.  This Opinion and Order will dismiss the statutory claims against the DRBA; the Court, like Defendants, does not address whether Plaintiff's statutory claims may be asserted against Mr. Johnson.

. . . Authority an employer of choice."  (Id. at ¶ 7.)  In her capacity as Chief Human Resources Officer, Plaintiff reported directly to Defendant James T. Johnson, Jr., the Executive Director of the DRBA.  (Id. at ¶¶ 3, 9.)

According to the allegations in the Complaint, while Plaintiff had a good working relationship with Mr. Johnson during the first two years of her employment, her relationship with Mr. Johnson began to deteriorate in May 2005.  (Id. at ¶¶ 14, 17.) In May 2005, Plaintiff began to harbor concerns about the DRBA's search for a new Chief Financial Officer ("CFO") – she disapproved of the outside recruiting consultant whom the DRBA employed during the hiring process and felt that the process was being "manipulat[ed]" – and she expressed her concerns to Mr. Johnson on multiple occasions.  (Id. at ¶ 18.)  In response to Plaintiff's criticism of the CFO search process, "Mr. Johnson disregarded and dismissed Mrs. Spence-Parker's [] concerns . . . and became increasingly critical of Mrs. Spence-Parker, acting increasingly argumentative and condescending toward her."  (Id. at ¶ 19.)

In particular, Plaintiff alleges that Mr. Johnson engaged in the following conduct over the course of approximately three years: (1) Mr. Johnson falsely accused Plaintiff of "going over his head" to express concerns about the CFO search process to the DRBA commissioners, (id. at ¶ 20); (2) Mr. Johnson told Plaintiff

3

that there were "rumors []flying around with [her] name attached to many of them," (id. at ¶ 22); (3) Mr. Johnson excluded Plaintiff from several meetings essential to her job duties as Chief Human Resources Officer and reassigned some of Plaintiff's job duties, (id. at ¶¶ 23, 38-39); (4) Mr. Johnson required Plaintiff to submit weekly updates of human resources activities when other DRBA executives did not have to submit such updates, (id. at ¶ 24); (5) Mr. Johnson said in Plaintiff's presence, "I know I cannot fire tenured employees, but I know how to get them – death by a thousand paper cuts," (id. at ¶ 25); (6) during a meeting with Plaintiff, Mr. Johnson closed the door to his office and screamed at her for forty-five minutes, telling her that she had mishandled the CFO search process, that she did not understand workplace politics, and that she "was not worth the money she was paid," (id. at ¶ 27); (7) Mr. Johnson removed Plaintiff from a committee that she had created because he did not want her to be the "face" of the committee, (id. at ¶ 29); (8) Mr. Johnson's secretary intercepted Plaintiff's mail, opened it, and did not deliver it to Plaintiff, (id. at ¶ 30); (9) Mr. Johnson falsely accused Plaintiff of stealing from the DRBA, (id. at ¶ 31); (10) Mr. Johnson sent "threatening emails" to Plaintiff because she was unable to schedule a training session around his schedule, (id. at ¶ 32); (11) Mr. Johnson refused to permit the DRBA's Public Information Officer to release an acknowledgment

4

that several DRBA employees, including Plaintiff, had received a human resources certification, (id. at ¶ 33); (12) Mr. Johnson wrote a "letter of reprimand" to Plaintiff wrongly accusing her of having omitted information from a draft harassment policy, (id. at ¶ 34); (13) Mr. Johnson refused to authorize Plaintiff's participation in a volunteering opportunity, notwithstanding the DRBA's policy position encouraging volunteer work, (id. at ¶ 36); (14) Mr. Johnson did not invite Plaintiff to a Delaware Chamber of Commerce dinner, despite inviting her peers and subordinates, (id. at ¶ 40); and (15) Mr. Johnson refused to credit Plaintiff with an additional vacation day after she worked on a holiday. (Id. at ¶ 41.)

In September 2007, Plaintiff met with the Chair and Vice-Chair of the DRBA Board of Commissioners Personnel Committee in order to express her concern over Mr. Johnson's conduct. (Id. at ¶ 37.) The Committee told Plaintiff to "keep her head down and do her job," and told her that they would follow up with her upon further review of the dispute. (Id.) Mr. Johnson's allegedly hostile conduct did not cease in the wake of her complaint to the Personnel Committee. (Id.) Finally, on March 14, 2008, allegedly as a result of Mr. Johnson's sustained hostile conduct "and upon recommendation of her physician," Plaintiff tendered her resignation to Mr. Johnson and the DRBA. (Id. at ¶ 42.)

2.   The DRBA Personnel Manual

Plaintiff's common law claims turn in part on certain provisions of the DRBA's Personnel Manual, which are reviewed below.[2]  The Manual provides on its first page:

> This Manual provides general descriptions and guidelines concerning the Authority's personnel policies and practices . . . . The Authority may, where appropriate, deviate from the policies and practices described herein on a case by case basis and subject to the approval of the Commissioners' Personnel Committee.  This Manual is not a contract, and nothing in this booklet is intended or shall be deemed to vest any right in any employee of the Authority.

(Pl.'s Br. Ex. B at 1.)

Section XVIII of the Manual, which Plaintiff invokes in support of her contract-based claims, states:

> Each permanent full-time employee, who has held that status for a period of at least twelve (12) months shall be deemed to be employed upon the condition that the employee shall not be removed from the particular office, position or employment except for good and sufficient cause or reason.  It is the intent of these regulations to create for the permanent full-time employee of the Authority a tenure of employment which shall be permanent, subject to good behavior, the proper performance of the employee's duties, or the possible reorganization or reduction in personnel (in whole or part) made in good faith in the interest of efficiency or economy.

_____

[2]  On a motion to dismiss brought pursuant to Rule 12(b)(6), Fed. R. Civ. P., the parties "may supplement the complaint by adding exhibits such as public records and other indisputably authentic documents underlying the plaintiff's claims." Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir. 2003).  The Personnel Manual, the authenticity of which neither party has disputed, underlies Plaintiff's contractual claims and may thus be accounted for under Rule 12(b)(6).

(Id. at 67.)  Among the non-exhaustive list of examples of "good and sufficient cause" set forth in the Manual are incompetency, insubordination, violation of the Authority's drug or anti-harassment policies, and neglect in the performance of duties. (Id. at 67-68.)

B.    **Procedural History**

Plaintiff commenced this action in New Jersey Superior Court, and Defendants removed the matter to this Court pursuant to 28 U.S.C. § 1441(b) [Docket Item 1].  In her Complaint, Plaintiff asserts common law claims for breach of contract (Count I) and breach of the duty of good faith and fair dealing (Count II); a claim that Defendants violated the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq. (Count III); and a claim that Defendants violated the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq. (Count IV).[3]  Defendants filed a motion to dismiss [Docket Item 4] in lieu of an answer, as to which the Court heard oral argument on February 26, 2009 and reserved decision.

**III. DISCUSSION**

A.    **Standard of Review**

On a Rule 12(b)(6) motion to dismiss for failure to state a claim for which relief may be granted, the Court must "accept all

---

[3]  The Complaint incorrectly labels this Count as "Count VI."

factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

> While Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because "it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level."

Phillips, 515 F.3d at 234.  "To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)).

When deciding a motion to dismiss, the Court generally looks only to the complaint, matters of public record, and "other indisputably authentic documents underlying the plaintiff's claims," such as the agreement upon which contract-based claims are based.  Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir. 2003).

**B.   Overview**

The viability of Plaintiff's claims turns in large part on

8

the question of whether New Jersey may subject the DBRA, a bistate Compact Clause entity operating ferry boats and facilities between Cape May, New Jersey and Lewes, Delaware, to its statutory and common law.[4]  The following discussion explains the general principles governing the application of state law to such bistate entities and reviews the relevant provisions of the compact at issue in this case before addressing the merits of Plaintiff's claims.[5]

     1.   <u>Application of State Law to Bistate Compact</u>
          <u>Entities</u>

"Under the Compact Clause, Article I, Section 10, Clause 3 of the United States Constitution, states may enter into agreements regarding matters of common concern provided they obtain the consent of Congress."  <u>International Union of Operating Engineers, Local 542 v. Delaware River Joint Toll Bridge Commission</u> ("<u>Local 542</u>"), 311 F.3d 273, 274 (3d Cir.

---

[4]  The Court notes at the outset that this is not a question of sovereign immunity, as bistate entities are not, as a general matter, immune from suit in federal court.  <u>See</u> <u>Hess</u>, 513 U.S. at 41 ("Suit in federal court is not an affront to the dignity of a Compact Clause entity, for the federal court, in relation to such an enterprise, is hardly the instrument of a distant, disconnected sovereign; rather, the federal court is ordained by one of the entity's founders.").

[5]  This Court has subject matter jurisdiction over Plaintiff's Complaint because "[t]he construction of a bi-state compact that has been consented to by Congress pursuant to the Compact Clause presents a federal question."  <u>International Union of Operating Engineers, Local 542 v. Delaware River Joint Toll Bridge Commission</u>, 311 F.3d 273, 275 (3d Cir. 2002) (citation omitted).

2002).  As the Supreme Court has explained:

> Bistate entities occupy a significantly different
> position in our federal system than do the States
> themselves.  The States, as separate sovereigns, are the
> constituent elements of the Union.  Bistate entities, in
> contrast, typically are creations of three discrete
> sovereigns: two States and the Federal Government.  Their
> mission is to address interests and problems that do not
> coincide nicely either with the national boundaries or
> with State lines - interests that may be badly served or
> not served at all by the ordinary channels of National or
> State political action.

Hess, 513 U.S. at 40 (internal quotations and citations omitted).

Bistate entities thus are not "extensions of each compacting

state's authority," but are instead formed through each state's

surrender of a portion of its sovereignty to the compact entity.

Local 542, 311 F.3d at 276.[6]  "Such a surrender of state

---

[6]  As one commentator recently observed, "[c]ompact agencies
and entities are said to exist in a no-man's land.  They lie
somewhere in the space between independent and dependent,
sovereign and subject, state and federal."  Matthew S.
Tripolitsiotis, Bridge over Troubled Waters: The Application of
State Law to Compact Clause Entities, 23 Yale L. & Pol'y Rev.
163, 167 (2005) (internal quotations and citations omitted).
Numerous unusual legal outcomes have been noted to have resulted
from these entities' unique legal status:

> [W]orkers have the right to unionize and force collective
> bargaining in both Pennsylvania and New Jersey, while
> workers on many bridges between Pennsylvania and New
> Jersey do not enjoy such a right.  New York and New
> Jersey both have anti-discrimination laws, but those laws
> do not apply to people working on bridges between the two
> states. Maryland, Virginia, and the District of Columbia
> have all adopted freedom of information laws, but the
> agency that operates rail bridges between them is not
> subject to any of those policies.  These paradoxes stem
> from the fact that the entities in control of many
> trans-state resources – entities such as the Port
> Authority of New York and New Jersey – often exist in a

sovereignty should be treated with great care, and the Supreme
Court has stated that courts should not find a surrender unless
it has been 'expressed in terms too plain to be mistaken.'" Id.
(quoting Jefferson Branch Bank v. Skelly, 66 U.S. 436, 446
(1861)). The terms of a state's surrender of portion of its
sovereignty to a compact entity are found in the compact
agreement itself, which is a "contract[] subject to the
principles of contract law." Doe v. Pennsylvania Bd. of
Probation and Parole, 513 F.3d 95, 105 (3d Cir. 2008).

The construction of a bistate compact is "a question of
federal law." Local 542, 311 F.3d at 279 n.4; see also Cuyler v.
Adams, 449 U.S. 433, 442 (1981).[7] The question of whether and to
what extent the laws of the compacting states apply to a bistate
entity they create has been approached differently by different
courts, but has been clarified considerably in this Circuit by
the Court of Appeals' decision in Local 542. As a general
matter, Local 542 emphasizes that the extent to which each
compacting state's laws apply to a compact entity turns

---

    state of legal limbo.

Id. at 163-64 (footnotes omitted).

    [7] See also Pievsky v. Ridge, 98 F.3d 730, 733 (3d Cir.
1996) ("Since the Compact is an interstate agreement which
requires the consent of Congress, such Congressional consent
transforms the Compact into an agreement pursuant to federal law.
Our interpretation of the terms and conditions of the Compact is,
therefore, governed by federal law") (citations omitted).

exclusively on the language of the compact and the intent of the contracting states.  Id. at 280 ("Our first and last order of business is interpreting the compact; we may not read into it language or intent that is simply not there.") (internal quotations and citations omitted).

More specifically, Local 542 addressed the issue of whether a compacting state, after having entered into a bistate compact, can modify the terms of the compact by passing legislation that applies to the bistate entity.  The Court of Appeals held that in the absence of an express provision in the compact authorizing the compacting states to modify the obligations placed upon the entity through the passage of legislation "concurred in" by both states, one compacting state could not unilaterally impose such obligations by applying new laws to the entity.  Id.  Joint amendment of the compact itself was the only means available to these states to adjust the legal obligations imposed upon the compact entity.

While Local 542 thus addressed a compact that was silent as to the capacity of the compacting states to modify the compact, the case was decided against the backdrop of compact entity jurisprudence addressing the more common question of whether compacting states may apply new legislation to a bistate entity whose compact permits modification through legislation "concurred in" by both states.  As the court explained:

> The most notable difference of opinion regarding the interpretation of "concurred in" language is between the courts of New York and those of New Jersey.  New York courts have interpreted the "concurred in" language in a compact to permit application of states' laws to the compact [only] if the states' legislation contains an express statement that they intend to amend the compact. New Jersey courts have held that this language will be effective to apply the states' laws that are "complementary or parallel" even where there is no stated intent to amend the compact.

Local 542, 311 F.3d at 276.  Although the decision in Local 542 turned largely on the absence of "concurred in" language in the compact at issue in that case, the court expressed in no uncertain terms its disapproval of the "complementary or parallel" test – the court noted that it was "persuaded . . . by the logic of the reasoning underpinning the New York express intent standard," and explained that "the New Jersey complementary or parallel standard appears to be based on a misinterpretation of compact law."  Id. at 280.  As the court went on to explain, "[p]rinciples of federalism . . . caution against inferring an intent to amend . . . [because a] bi-state entity, created by compact, is 'not subject to the unilateral control of any one of the States that compose the federal system.'"  Id. (quoting Hess, 513 U.S. at 42).

### 2.   The Delaware River and Bay Authority Compact

In 1962, the states of New Jersey and Delaware entered into the Delaware River and Bay Authority Compact (the "DRBA Compact" or "Compact") "with the intention of advancing the economic

13

growth and development of those areas in both states which border
the Delaware River and Bay by the financing, development,
construction, operation and maintenance of crossings,
transportation or terminal facilities, and other facilities of
commerce, and by providing for overall planning for the future
economic development of those areas." N.J.S.A. 32:11E-1.
Congress approved the Compact in 1962. Pub. L. No. 87-678
(1962).

The Compact establishes "a body politic, to be known as 'The
Delaware River and Bay Authority' . . . which shall constitute an
agency of government of the State of Delaware and the State of
New Jersey." N.J.S.A. 32:11E-1 at Art. IV. Among the many
powers granted the Authority in the Compact is the power to
"appoint, or employ, such other officers, agents, attorneys,
engineers and employees as it may require for the performance of
its duties and to fix and determine their qualifications, duties,
compensation, pensions, terms of office and all other conditions
and terms of employment and retention." Id. at Art. VII. The
Compact further authorizes the DRBA to "enter into contracts and
agreements with either state or with the United States, or with
any public body, department, or other agency of either state or
of the United States or with any individual, firm or corporation,
deemed necessary or advisable for the exercise of its purposes
and powers." Id.

14

In addition to these (and numerous other) expressly delineated powers, the Compact authorizes the DRBA "[t]o exercise all other powers not inconsistent with the Constitutions of the two states or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes," id., a provision which, courts have long held, authorizes the DRBA to sue and be sued.  Delaware River and Bay Authority v. International Organization of Masters, Mates, & Pilots, 45 N.J. 138, 147 (1965).  As to the imposition of additional obligations on the Authority by the compacting states, the Compact provides that "no additional duties or obligations shall be undertaken by the authority under the law of either state or of Congress without authorization by the law of both states."  N.J.S.A. 32:11E-1, Art. VIII (emphasis added).  Finally, under the heading "Review and Enforcement of Rules," the Compact provides:

> Judicial proceedings to review any bylaw, rule, regulation, order or other action of the authority or to determine the meaning or effect thereof, may be brought in such court of each state, and pursuant to such law or rules thereof, as a similar proceeding with respect to any agency of such state might be brought.
>
> Each state may provide by law what penalty or penalties shall be imposed for violation of any lawful rule, regulation or order of the authority, and, by law or rule of court, for the manner of enforcing the same.

Id. at Art. XV.

C.  **Plaintiff's Claims**

The DRBA has moved to dismiss all four of Plaintiff's claims, arguing that the it is not subject to any of the New Jersey laws under which Plaintiff's claims are brought, and alternatively, that Plaintiff's allegations are insufficient to state a claim.  For the reasons explained below, the Court will grant Defendants' motion to dismiss Plaintiff's CEPA and NJLAD claims against the DRBA, but deny the motion to dismiss her common law claims.

1.  <u>CEPA Claim</u>

New Jersey's CEPA was enacted in 1986 "to provide broad protections against employer retaliation for workers whose whistle-blowing actions benefit the health, safety and welfare of the public." <u>Feldman v. Hunterdon Radiological Associates</u>, 187 N.J. 228, 239 (2006) (internal quotations and citations omitted). The statute affords a private right of action to "[a]ny aggrieved employee . . . [to] enforce the provisions of this act by means of a civil action." N.J.S.A. 34:19-13.  In her Complaint, Plaintiff asserts that Defendants retaliated against her after she complained to Mr. Johnson that the CFO search process was being "manipulat[ed]," (Compl. ¶ 18), and alleges that such retaliation violated the CEPA.  Defendants argue that under <u>Local 542</u>, the CEPA does not apply to DRBA.

The Court holds that the CEPA does not apply to the DRBA and

will thus grant the DRBA's motion to dismiss this claim.  As the
Court of Appeals has made clear, in determining whether New
Jersey and Delaware intended for the DRBA to be subject to suit
under the CEPA, the Court's "first and last order of business is
interpreting the compact."  Local 542, 311 F.3d at 280 (internal
quotations and citations omitted).  In interpreting the Compact
to assess whether the states' surrender of sovereignty
encompassed exposing the DRBA to suit under New Jersey's CEPA,
the Court must likewise bear in mind that "a surrender of state
sovereignty should be treated with great care, and . . . that
courts should not find a surrender unless it has been 'expressed
in terms too plain to be mistaken.'"  Id. at 276 (quoting Skelly,
66 U.S. at 446).

     The Compact at issue in this case does not express in such
plain terms that the CEPA applies to the DRBA, and there simply
is no indication that Delaware, in ceding a limited portion of
its sovereignty to the Authority, agreed to permit the DRBA to be
subjected to New Jersey's CEPA.  Indeed, whereas the CEPA
"establishes a statutory exception to the general [common law]
rule that an employer may terminate an at-will employee with or
without cause," Feldman, 187 N.J. at 238 (citation omitted), the
language of the Compact is consistent with the general rule, not
CEPA's exception; the Compact expressly invests in the Authority
the power to employ staff "as it may require for the performance

of its duties and to fix and determine their qualifications,
duties, compensation, pensions, <u>terms of office and all other
conditions and terms of employment and retention</u>."  N.J.S.A.
32:11E-1 at Art. VII (emphasis added).  Nothing in this language,
or elsewhere in the Compact, indicates that the Authority's power
to "fix and determine [employees'] . . . terms of office and . .
. conditions and terms of employment and retention," <u>id.</u>, is
subject to the CEPA's exception to the general common law rule of
at-will employment.[8]  That is, the plain language of the Compact
does not even remotely suggest that it was the compacting states'
intent to subject the Authority to the CEPA's requirements for
the treatment of whistle-blowing employees.[9]

---

[8]  Nor is it dispositive of the question before the Court
that the definition of "employer" in the CEPA includes "any
authority, commission, or board or any other agency" of the
State.  N.J.S.A. 34:19-2a.  As the Appellate Division emphasized
in holding that the CEPA does not apply to the Delaware River
Port Authority, "[w]hile DRPA may arguably fall within this
definition, all that this connotes is that DRPA could be subject
to CEPA if the concurrence of Pennsylvania or the consent of DRPA
had been established."  <u>Ballinger v. Delaware River Port
Authority</u>, 311 N.J. Super. 317, 329 (App. Div. 1998).  As the
preceding discussion makes clear, nothing on the face of the
Compact suggests that either Delaware or the Authority has
consented to the application of the CEPA to the DRBA.

[9]  The Court is unconvinced by Plaintiff's argument that the
express language of the Compact authorizes the application of the
CEPA to the DRBA.  In support of this argument, Plaintiff draws
the Court's attention to Article XV of the Compact, entitled
"Review and Enforcement of Rules," which states in relevant part:

> Judicial  proceedings  to  review  any  bylaw,  rule,
> regulation, order or other action of the authority or to
> determine the meaning or effect thereof, may be brought

Unlike the compact at issue in <u>Local 542</u>, the Compact in this case provides a means for New Jersey and Delaware to impose additional obligations upon the DRBA through the passage of legislation.  <u>See</u> N.J.S.A. 32:11E-1, Art. VIII ("no additional duties or obligations shall be undertaken by the authority under

_____

in such court of each state, and pursuant to such law or rules thereof, as a similar proceeding with respect to any agency of such state might be brought.

N.J.S.A. 32:11E-1, Art. XV.  Plaintiff appears to argue that this provision authorizes the general "application of state law to the Authority."  (Pl.'s Opp'n Br. at 11.)

    This argument is not persuasive.  As Defendant argues, the language of the provision cited by Plaintiff indicates unmistakably that it merely authorizes judicial review of final agency actions.  <u>See</u>, <u>e.g.</u>, <u>In re Carter</u>, 191 N.J. 474, 482 (2007) ("The scope of appellate review of a final agency decision is limited, and we do not ordinarily overturn such a decision in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence") (internal quotations and citations omitted).  As the court held in <u>Chafin v. Delaware River and Bay Auth.</u>, Article XV does not "entitle[] [a plaintiff] to bring state law claims" against the Authority, but instead merely permits the Court to review final decisions of the Authority under "an 'arbitrary and capricious' standard, the general standard employed for court reviews of agency decisions." <u>Chafin v. Delaware River and Bay Auth.</u>, No. 06-836, slip op. at 4 (D.N.J. June 24, 2008).  Given the Supreme Court's prescription that surrenders of state sovereignty must be "expressed in terms too plain to be mistaken," <u>Skelly</u>, 66 U.S. at 446, Plaintiff's suggestion that in providing for judicial review of final agency actions, the compacting states authorized the general "application of state law to the Authority," (Pl.'s Opp'n Br. at 11), is untenable.  This is particularly true in light of the fact that the fact that the Compact expressly states that "authorization by the law of both states" is required in order for the Authority to undertake "additional duties or obligations."  N.J.S.A. 32:11E-1, Art. VIII.  In short, Article XV provides for judicial review of final actions of the Authority; it does not open the door to the application of the entirety of both states' laws to the Authority.

19

the law of either state or of Congress without authorization by
the law of both states"). In apparent reliance upon this
provision, Plaintiff argues that the CEPA should apply to DRBA
because both New Jersey and Delaware have passed whistle-blower
protection laws that, according to Plaintiff, are complementary
and parallel. See N.J.S.A. 34:19-1, et seq.; 19 Del. C. § 1702,
et seq.

This argument fails for two reasons. First, in light of the
determination by the Court of Appeals that "the New Jersey
complementary or parallel standard appears to be based on a
misinterpretation of compact law" and its endorsement of the
"logic of the reasoning underpinning the New York express intent
standard," Local 542, 311 F.3d at 280, the New Jersey standard no
longer appears to be good law in this Circuit.

Second, even if the Court were to find that Local 542 is
limited to the facts of that case and conclude that the rejection
of the New Jersey standard by the Court of Appeals was mere
dicta,[10] the language of the Compact before the Court does not

_____

[10] Such a conclusion would not appear to be warranted in
light of the reasoning in Local 542. First, the statement of the
Court of Appeals that "[w]e are persuaded, first, by the fact
that the Compact does not contain any provision enabling either
state to modify it through legislation 'concurred in' by the
other, and second, by the logic of the reasoning underpinning the
New York express intent standard," Local 542, 311 F.3d at 280
(emphasis added), suggests that its endorsement of the New York
standard was not mere dicta. See Ponnapula v. Ashcroft, 373 F.3d
480, 488 (3d Cir. 2004) (a discussion in an opinion "is dicta
[if] it is not necessary to that opinion's holding"). Even if

suggest that it is susceptible to interpretation under the complementary or parallel standard.  That is, courts have applied the complementary or parallel standard to compacts that contain language "enabling the states to modify [the compact] by passing legislation that is 'concurred in' by the other state."  Id. at 274 (emphasis added).  Such an approach is at least supportable in the case of compacts containing the "concurred in" phrasing, because the verb "concur" could suggest either a coincidental or express agreement.  See Webster's II New Riverside University Dictionary 295 (2d ed. 1988) (defining "concur" as "to have or express the same opinion" or "to act together").  By contrast, the Compact in this case permits modification only via "authorization by the law of both states," N.J.S.A. 32:11E-1, Art. VIII, language that is not susceptible to the coincidental or passive interpretation that is plausible in the case of the "concurred in" phrasing.  In other words, the language of this Compact requires joint "authorization," id., not mere concurrence, and such authorization does not take place merely upon the coincidental passage of similar legislation by New Jersey and Delaware.

    In short, the mere passage by New Jersey and Delaware of

_____

the court's discussion of the New Jersey and New York standards
could be characterized as dicta, however, its language is
forceful, and not the sort of offhanded remark that this
subordinate Court could lightly disregard.

21

similar whistle-blower protection laws is not sufficient, under
Local 542 and the language of the Compact at issue in this
lawsuit, to apply such laws to the DRBA.  Instead, such laws will
apply to the Authority only "if the states' legislation contains
an express statement that they intend to amend the compact."
Local 542, 311 F.3d at 276.  No such express statement exists in
the states' legislation, which indicates that the CEPA does not
apply to the DRBA.  The Court will accordingly grant the DRBA's
motion to dismiss Plaintiff's CEPA claim.[11]

    2.  NJLAD Claim

For substantially the same reasons, Plaintiff's NJLAD claim
against the DRBA will likewise be dismissed.  Once again, while
Plaintiff attempts to identify the similarities between the NJLAD

---

[11]  Defendant argues that N.J.S.A. 34:19-8, known as CEPA's
"waiver provision," requires that Plaintiff's remaining claims be
dismissed.  This argument is without merit.  The waiver provision
provides that "the institution of an action in accordance with
this act shall be deemed a waiver of the rights and remedies
available under any other contract, collective bargaining
agreement, State law, rule or regulation or under the common
law."  N.J.S.A. 34:19-8.  The New Jersey Supreme Court rejected
the very argument raised by Defendant regarding the waiver
provision in Ballinger v. Delaware River Port Authority:

> The determination of whether a viable CEPA claim could be
> brought against [the Delaware River Port Authority] could
> be made only by a court of law.  This Court now having
> decided that the claim cannot be brought, plaintiff
> Ballinger should not now be denied any possible rights
> that may still exist under our state common law.

Ballinger v. Delaware River Port Authority, 172 N.J. 586, 602
(2002).  Under Ballinger, Plaintiff may pursue her state common
law claims following the Court's dismissal of her CEPA claim.

and Delaware's Discrimination in Employment Act (the "DDEA"), 19 Del. C. § 1702, et seq., under the logic of Local 542, the question in determining whether a state law applies to a bistate entity is no longer whether the compacting states have passed parallel legislation, but is instead whether the states have expressly and jointly stated that a particular law amends the compact and thereby applies to the bistate entity. See Local 542, 311 F.3d at 280; Evans, 2003 WL 25749089, at *20. Nothing in the language of the Compact suggests that New Jersey and Delaware intended for the NJLAD or the DDEA to apply to the DBRA, and neither of the states' antidiscrimination laws appears to mention the DRBA. Under the express intent standard endorsed by the Court of Appeals in Local 542, the absence of an express statement that the states intended for one or both of these antidiscrimination statutes to apply to the DRBA renders Plaintiff's NJLAD claim unsustainable. See Baron v. Port Auth. of New York and New Jersey, 968 F. Supp. 924, 929 (S.D.N.Y. 1997) (applying the express intent standard to state antidiscrimination law).

In Local 542, the Court of Appeals cited with approval cases in which courts applied the express intent standard and held that the "absence from the text and legislative history of . . . [the] LAD of any mention of [the bistate entity], in addition to the absence of an express statement by either state legislature that

23

it was amending or supplementing the provisions of the Compact and that the law would take effect upon the enactment of identical legislation in the opposite state, seems to indicate that neither [state] legislature[] intended the laws to apply to the internal operations of [the bistate entity]." <u>Settecase v. Port Auth. of New York and New Jersey</u>, 13 F. Supp. 2d 530, 535 (S.D.N.Y. 1998) (quoting <u>Baron</u>, 968 F. Supp. at 929); <u>see also Dezaio v. Port Auth. of New York & New Jersey</u>, 205 F.3d 62, 65 (2d Cir. 2000); <u>Rose v. Port Auth. of New York & New Jersey</u>, 13 F. Supp. 2d 516, 523 (S.D.N.Y. 1998).  This reasoning applies with equal force in this case, in which New Jersey and Delaware have not expressly indicated that the NJLAD applies to the DRBA. The Court accordingly finds, in the absence of an express statement from the states regarding the application of the NJLAD to the Authority, that the DRBA is not subject to suit under such a claim, and will grant the DRBA's motion to dismiss Plaintiff's NJLAD claim.

       3.  <u>Common Law Claims</u>

     For the reasons now explained, the Court will deny the DRBA's motion to dismiss Plaintiff's contractual claims.  As is discussed in detail below, the Court concludes that the DRBA may be subjected to suit based on contracts into which it has entered and allegedly breached.  In this matter, the determination of whether Plaintiff's common law claims are viable turns on a

24

threshold choice-of-law question which the Court cannot answer due to the absence of necessary information in the record, requiring that the DRBA's motion to dismiss Plaintiff's common law claims be denied at this time.  The Court's denial of the DRBA's motion to dismiss Plaintiff's common law claims is without prejudice to its right to move for summary judgment upon a record with sufficient evidence for the Court to address the choice-of-law issues explained below.

> a.   The DRBA May Be Subjected to Suit Based on Contractual Claims

The Court first addresses the question of whether the DRBA may be subjected to suit for breach of contract.  Looking to the language of the Compact and the intent of the compacting states, see Local 542, 311 F.3d at 280, it is apparent that the concerns reviewed supra concerning the applicability of the CEPA and the NJLAD to the DRBA do not require the dismissal of Plaintiff's contract-based claims.  Whereas the Compact is completely silent as to the applicability of the states' whistle-blower-protection and antidiscrimination statutes to the DRBA, it expressly authorizes the Authority to "enter into contracts and agreements with . . . any individual . . . deemed necessary or advisable for the exercise of its purposes and powers,"[12] N.J.S.A. 32:11E-1,

---

[12]  One such power expressly delineated in the Compact is the "power[] . . . [t]o . . . employ[] such . . . employees as it may require for the performance of its duties . . . "  N.J.S.A. 32:11E-1, Art. VII.

Art. VII, and contains a provision that has long been recognized
as a sue-and-be-sued clause.  See International Organization of
Masters, Mates, & Pilots, 45 N.J. at 147 (citing N.J.S.A.
32:11E-1, Art. VII).  Indeed, the Authority has continuously
availed itself of these powers by, e.g., entering into contracts
and filing lawsuits, pursuant to the laws of both New Jersey and
Delaware, against its contractual partners when those contracts
have been breached.  See, e.g., Delaware River and Bay Auth. v.
York Hunter Const., Inc., 344 N.J. Super. 361, 364 (Chan. Div.
2001) (explaining that the Authority "filed a verified complaint
seeking an accounting and damages against [Defendant] on theories
of conversion and breach of contract"); Delaware River and Bay
Auth. v. Gauntt Const. Co., No. 9952, 1989 WL 3220 (Del. Ch. Jan.
19, 1989) (same).

In light of the fact that the Compact expressly authorizes
the DRBA to enter into contracts and to sue parties who breach
their contractual agreements with the Authority, it simply does
not subject either of the compacting states "to the unilateral
control of any one of the States," Hess, 513 U.S. at 42, to hold
that the Authority's power to contract and sue over contractual
breaches carries with it the attendant possibility that the
Authority itself may be sued for breach of contract.[13]  See

_____

[13]  The Court's conclusion herein is to be distinguished
from Moore v. Delaware River Port Authority, 80 F. Supp. 2d 264,
271 (D.N.J. 1999), which was decided before Local 542's rejection

26

<u>Chafin v. Delaware River and Bay Auth.</u>, No. 06-836, 2006 WL
3780765, at *7 (D.N.J. Dec. 20, 2006) (noting that it "would be a
perverse rule of law if the authority was empowered to enter into
contracts without being held accountable under the law of
contracts").  That is, in the Compact, Delaware and New Jersey
expressly consented to the surrender of that portion of their
sovereignty necessary for the Authority to "enter into contracts
and agreements with . . . any individual . . . deemed necessary
or advisable for the exercise of its purposes and powers,"
N.J.S.A. 32:11E-1, Art. VII (including the power to enter into
employment contracts, N.J.S.A. 32:11E-1, Art. VII), and to sue
and be sued over legal obligations arising out of such contracts.
See <u>International Organization of Masters, Mates, & Pilots</u>, 45
N.J. at 147; <u>York Hunter</u>, 344 N.J. Super. at 364; <u>cf.</u> <u>Baron v.
Port Auth. of New York and New Jersey</u>, 105 F. Supp. 2d 271, 275
(S.D.N.Y. 2000), <u>aff'd</u> 271 F.3d 81 (2d Cir. 2001) (applying
state-law implied employment contract claims to Compact Clause
entity).

The Court accordingly holds that the DRBA may be subject to
suit for breach of contract claims under the terms of its
Compact.[14]  <u>See</u> <u>id.</u>

_____

of the complementary or parallel standard.

[14]  Plaintiff's claims, to be sure, are based upon the
DRBA's alleged breach of an agreement expressed in its Personnel
Manual.  Under New Jersey's <u>Woolley</u> doctrine, as the Court

b.   <u>Choice of Law</u>

Plaintiff asserts claims of breach of contract and breach of the implied covenant of good faith and fair dealing under New Jersey law, claims which are premised upon Plaintiff's assertion that her resignation was the product of a constructive discharge brought about by Mr. Johnson's allegedly hostile conduct.  While Plaintiff appears to recognize the general common law principle that "a contract for employment, unless otherwise expressly stated, is at-will in nature," <u>Lindsey v. M.A. Zeccola & Sons, Inc.</u>, 26 F.3d 1236, 1241 (3d Cir. 1994) (citation omitted), she argues that the DRBA's Personnel Manual contained an implied promise that she would only be terminated for cause, and asserts that she was constructively discharged in violation of this promise.

Before the Court can assess the merits of Plaintiff's contract claims, it must determine which state's substantive laws

_____

explains below, "[a]n employment manual may alter an employee's at-will status by creating an implied contract between an employer and employee."  <u>Wade v. Kessler Institute</u>, 172 N.J. 327, 339 (2002).  The DRBA has identified no reason why it may not be subjected to suits based on breaches of implied contracts, and, indeed, courts have held that bistate entities may be sued under such a theory.  <u>See Baron</u>, 105 F. Supp. 2d at 275.  A <u>Woolley</u> contract, after all, is still a contract.  <u>See Noye v. Hoffmann-La Roche Inc.</u>, 238 N.J. Super. 430, 432 (App. Div. 1990) ("The <u>Woolley</u> contract is no more than the ordinary result of an acceptance by plaintiff, by continuing to work, of the terms of employment offered by defendant's handbook").

apply to her claims.[15]  See Baron, 105 F. Supp. 2d at 275

(applying the "choice of law rules of the forum state" to

determine whether New York or New Jersey common law applied to an

implied contract claim asserted by a former employee against a

bistate Compact Clause entity).  This determination is critical

in this case, since, as will become clear below, Plaintiff's

claims may be viable under New Jersey law, but are not under

Delaware law.  As the Court now explains, the record herein is

insufficient for the Court's choice-of-law determination, which

means that the motion of the DRBA, which bears the burden of

proof as to dismissal, will be denied as to Plaintiff's common

law claims.

i.   <u>New Jersey Choice of Law Principles</u>

The Court applies New Jersey's choice-of-law rules to

determine whether New Jersey or Delaware substantive law applies

to Plaintiff's contract-based claims.  See Berg Chilling Systems,

Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006); Baron, 105

F. Supp. 2d at 275.  New Jersey's choice-of-law rules for

contract claims call for a two-step analysis.  The Court first

---

[15]  Plaintiff is a New Jersey resident, (Compl. ¶ 1), and
the DRBA is "an agency of government of the State of Delaware and
the State of New Jersey."  N.J.S.A. 32:11E-1 at Art. IV.  The
record is silent as to where Plaintiff's employment agreement was
negotiated and where she performed her employment duties,
although it appears that the DRBA's principal office is located
in Delaware, see DRBA, http://www.drba.net/customer/customer.html
(last visited Mar. 24, 2009), a fact of which the Court takes
judicial notice.

assesses whether there is an "actual conflict" between the laws of the potentially interested states on the issue in question; if there is no divergence between the potentially applicable laws, the Court is "presented with a false conflict," Curtis T. Bedwell and Sons, Inc. v. Geppert Bros., Inc., 280 N.J. Super. 391, 395 (App. Div. 1995), and the choice-of-law "inquiry is over." Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006).

If there is an actual conflict between the two states' laws, the Court determines "which state has the most meaningful connections with and interests in the transaction and the parties." NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314, 319 (3d Cir. 1995). Although a host of factors may figure into this governmental interests analysis, id., "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state" will apply. Restatement (Second) of Conflicts § 188(3).

### ii.  Actual Conflict

Plaintiff's common law claims are sustainable under New Jersey law, but not under Delaware law, meaning that there is an actual conflict between the states' laws. Curtis T. Bedwell and Sons, 280 N.J. Super. at 395. The chief argument advanced by Defendants in moving to dismiss Plaintiff's contractual claims is that Plaintiff was an at-will employee subject to termination for any reason, and so the DRBA breached no contractual obligation

related to her alleged constructive discharge.[16]  In opposing
Defendants' argument, Plaintiff asserts that the DRBA's Personnel
Manual contained an implied promise that she would only be
terminated for cause.  As the Court now explains, New Jersey law
would recognize and enforce such an implied promise from the
Personnel Manual at issue in this case, but Delaware law would
not.

Under New Jersey law, while "an employer may fire an
employee for good reason, bad reason, or no reason at all under
the employment-at-will doctrine," Wade v. Kessler Institute, 172

---

[16]  The DRBA also argues that Plaintiff's term of employment
ended due to her resignation, not as the result of a breach of
any contract (implied or otherwise) by the DRBA, which, it
asserts, forecloses her assertion of contractual claims.  In
light of Plaintiff's allegations supporting her claim that she
was constructively discharged, the Court is not, at this stage,
persuaded by Defendant's argument that Plaintiff's resignation
precludes her from maintaining a breach of contract claim.
"Standing alone, constructive discharge is neither a tort nor a
breach of contract, but a doctrine that transforms what is
ostensibly a resignation into a firing."  Alliance Metals, Inc.,
of Atlanta v. Hinely Industries, Inc., 222 F.3d 895, 901 (11th
Cir. 2000) (quoting Turner v. Anheuser-Busch, Inc., 876 P.2d
1022, 1030 (Cal. 1994)); see also Turner, 876 P.2d at 1030 ("a
constructive discharge may, in particular circumstances, amount
to breach of an employer's express or implied agreement not to
terminate except in accordance with specified procedures or
without good cause").  "A constructive discharge occurs when the
employer has imposed upon an employee working conditions 'so
intolerable that a reasonable person subject to them would
resign.'"  Daniels v. Mutual Life Ins. Co., 340 N.J. Super. 11,
17 (App. Div. 2001) (quoting Muench v. Township of Haddon, 255
N.J. Super. 288, 302 (App. Div. 1992)).  The allegations in the
Complaint that Plaintiff was subjected to such hostile working
conditions are sufficient, at the motion-to-dismiss stage, to
permit her common law claims to survive.

N.J. 327, 338 (2002) (citation omitted), "New Jersey law does
recognize a cause of action for breach of contract against
employers who fail to honor the express or implied promises made
in an employee manual or handbook." Ratti v. Service Management
Systems, Inc., No. 06-6034, at *4 (D.N.J. Aug. 25, 2008) (citing
Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284 (1985)).

> In Woolley, [the New Jersey Supreme Court] held that
> absent a clear and prominent disclaimer, an implied
> promise contained in an employment manual that an
> employee will be fired only for cause may be enforceable
> against an employer even when the employment is for an
> indefinite term and would otherwise be terminable at
> will.  The Court reasoned that when an employer of a
> substantial number of employees circulates a manual that,
> when fairly read, provides that certain benefits are an
> incident of the employment (including, especially, job
> security provisions), the judiciary, instead of
> grudgingly conceding the enforceability of those
> provisions, should construe them in accordance with the
> reasonable expectations of the employees.

Wade, 172 N.J. at 339 (internal quotations and citations omitted,
emphasis added).

The New Jersey Supreme Court clarified Woolley's
requirements for what constitutes a clear and prominent
disclaimer in Nicosia v. Wakefern Food Corporation:

> Although Woolley does not require the use of specific
> language for an effective disclaimer, it does require
> that a disclaimer make clear that the employer continues
> to have the absolute power to fire anyone with or without
> cause . . . . [A]n effective disclaimer must expressly
> advise its employees that they could be discharged at
> will.  In so doing, the language in the disclaimer must
> indicate, in straightforward terms, that the employee is
> subject to discharge at will . . . . The burden is not on
> the employee to draw inferences from the handbook
> language. . . . .

> Woolley also held that the disclaimer must be in a very
> prominent position.  Disclaimers in employee manuals fail
> for lack of prominence when the text is not set off in
> such a way as to bring the disclaimer to the attention of
> the reader.  [See McDonald v. Mobil Coal Producing, Inc.,
> 820 P.2d 986, 988 (Wyo. 1991)] (finding disclaimer that
> appeared on first page of employee manual as part of
> lengthy text not conspicuous because it was "not set off
> in any way, was placed under a general subheading, was
> not capitalized, and contained the same type size as
> another provision on the same page").

136 N.J. 401, 413-15 (1994) (some internal quotations and

citations omitted).[17]  In short, under New Jersey law, in the

absence of a "prominent" disclaimer written in "straightforward

terms" that an employee is subject to discharge at will, id., "an

implied promise contained in an employment manual that an

employee will be fired only for cause" is enforceable against an

employer.  Wade, 172 N.J. at 339 (internal quotations and

citations omitted).

Under Delaware law, although "[s]tatements in an employee

handbook may alter the at-will status," Mann v. Cargill Poultry,

Inc., No. 88C-AU37, 1990 WL 91102, at *5 (Del. Super. Ct. June

---

[17]  In explaining the contents of a Wooley disclaimer, the
New Jersey Supreme Court explained that an employee

> should not be expected to understand that [the
> employer's] characterization of its manual as "not
> contractual" or "subject to change and interpretation at
> the sole discretion of the Company" meant that the
> employer, despite the . . . termination provisions of its
> manual, reserved the absolute power to fire anyone with
> or without cause without actually changing those
> provisions.

Nicosia, 136 N.J. at 414 (some quotations and citations omitted).

13, 1990), the doctrine is limited in at least two important ways that the New Jersey doctrine is not.  See Lindsey, 26 F.3d at 1241 ("Delaware Courts will not hold an employment relationship to be anything but at-will absent clear and explicit terms providing otherwise") (citation omitted).  First, under Delaware law, an "employer's written or oral statements to a prospective employee concerning the conditions of his employment are not enforceable against the employer without some basic contract consideration," and, unlike New Jersey law, "something more than continued employment [is required] to constitute consideration." Mann, 1990 WL 91102, at *5, *7; compare Noye v. Hoffmann-La Roche Inc., 238 N.J. Super. 430, 432 (App. Div. 1990) ("The Woolley contract is no more than the ordinary result of an acceptance by plaintiff, by continuing to work, of the terms of employment offered by defendant's handbook"), with Heideck v. Kent General Hosp., Inc., 446 A.2d 1095, 1096 (Del. 1982) (where the handbook is "merely a unilateral statement of company policies," no contract is created).

Second, in contrast with Nicosia, Delaware courts have held that an employer may foreclose a contract claim based on an employee handbook simply by including a disclaimer stating that the handbook "do[es] not create . . . an employment agreement." Bunting v. Citizens Financial Group, Inc., No. 03-013, 2006 WL 1067321, at *4 (Del. Super.  Ct. Apr. 13, 2006); see also Brooks

34

v. Fiore, No. 00-803, 2001 WL 1218448, at *4 (D. Del. Oct. 11, 2001) (language providing that the "handbook . . . [does not] create or constitute an employment contract" is sufficient to foreclose implied contract claim).  That is, while New Jersey courts consider terms such as "not contractual" to be "confusing legalese" insufficient to defeat a Woolley claim, Nicosia, 136 N.J. at 414, Delaware courts find precisely the same language to constitute an effective disclaimer.  See Bunting, 2006 WL 1067321, at *4; Brooks, 2001 WL 1218448, at *4.

The upshot of this exposition for the case at hand is that the choice between New Jersey and Delaware law is dispositive. Under Delaware law, Plaintiff's contract claim appears to be unsustainable, because (1) the DRBA's manual is "merely a unilateral statement of company policies," Heideck, 446 A.2d at 1096, unsupported by consideration consisting of something "more than continued employment," Mann, 1990 WL 91102, at *7; and (2) the disclaimer in the Personnel Manual that it is "not a contract, and nothing in this booklet is intended or shall be deemed to vest any right in any employee of the Authority," (Pl.'s Br. Ex. B at 1), is sufficient as a matter of law in Delaware to defeat Plaintiffs' claim.  See Bunting, 2006 WL 1067321, at *4; Brooks, 2001 WL 1218448, at *4.  By contrast, under New Jersey law, consideration beyond "continuing to work" is not required to support a Woolley contract claim, Noye, 238

35

N.J. Super. at 432, and an employee "should not be expected to understand that [an employer's] characterization of its manual as 'not contractual' or subject to change and interpretation at the sole discretion of the [employer],'" disclaims Woolley liability. Nicosia, 136 N.J. at 414 (further characterizing such terms as "confusing legalese").  In short, the Court finds that there is an "actual conflict" between the potentially applicable state laws for choice-of-law purposes.  Curtis T. Bedwell and Sons, 280 N.J. Super. at 395.

### iii. Choice of Law

The Court's determination as to whether New Jersey or Delaware law requires an evaluation of a host of governmental interest considerations, see NL Industries, 65 F.3d at 319, including, most importantly, whether "the place of negotiating the contract and the place of performance are in the same state." Restatement (Second) of Conflicts § 188(3).  This determination is not possible on the present record, which gives no indication of whether Plaintiff's employment agreement was negotiated and performed in New Jersey or Delaware.  Given that the DRBA bears the burden of proof on its motion to dismiss, and that it has not proven that Plaintiff's claims, premised upon New Jersey law, must be dismissed, the Court will deny Defendants' motion as to Plaintiff's common law claims.  Defendants may move for summary judgment as to this choice-of-law question with evidence

36

sufficient for the Court's determination as to whether New Jersey or Delaware law governs Plaintiff's remaining claims.  See <u>NL Industries</u>, 65 F.3d at 319; Restatement (Second) of Conflicts § 188(3).

**IV.   CONCLUSION**

For the reasons explained above, the Court will grant the DRBA's motion to dismiss Plaintiff's CEPA and NJLAD claims, and deny the remainder of the relief sought.  The accompanying Order will be entered.


**March 30, 2009**                        **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge