IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                               :
TRUDY SPENCE-PARKER,           :        HON. JEROME B. SIMANDLE
                               :
             Plaintiff,        :        Civil No. 08-3740 (JBS/AMD)
                               :
       v.                      :
                               :          OPINION
DELAWARE RIVER AND BAY         :
AUTHORITY & JAMES JOHNSON,     :
                               :
             Defendants.       :
                               :
```

APPEARANCES:

Jeffrey P. Resnick, Esq.
Matthew A. Tucker, Esq.
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, PC
Fairway Corporate Center
4300 Haddonfield Road
Suite 311
Pennsauken, NJ 08109
     Attorneys for Plaintiff Trudy Spence-Parker

William F. Cook, Esq.
William M. Tambussi, Esq.
BROWN & CONNERY
360 Haddon Avenue
Westmont, NJ 08108
     Attorneys for Defendants Delaware River and Bay Authority
     and James Johnson

**SIMANDLE**, District Judge:

I.    **INTRODUCTION**

This matter is before the Court upon Defendants' motion for
summary judgment [Docket Item 18].  Plaintiff brings the
statutory and common law claims at issue herein against her
former employer, the Delaware River and Bay Authority ("DRBA" or
"Authority"), and her supervisor at the Authority, James Johnson.

Defendants previously moved to dismiss Plaintiff's claims against the DRBA [Docket Item 4], and, in its March 30, 2009 Opinion and Order [Docket Items 14 and 15], the Court granted the DRBA's motion as to Plaintiff's statutory claims (brought pursuant to the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et seq.), and denied the motion as to Plaintiff's common law claims, without prejudice to DRBA's right to move for summary judgment and to present sufficient evidence to enable the Court to decide whether New Jersey or Delaware law governs the common law claims.

The principal issue remaining before the Court upon Defendants' motion for summary judgment is a choice of law determination as to whether New Jersey or Delaware law applies to Plaintiff's remaining common law claims governing her employment with the bi-state DRBA.  In the present motion, Defendants also seek dismissal of all claims, statutory and common law, against Defendant Johnson.  For the reasons discussed herein, the Court will grant Defendants' motion for summary judgment as to Plaintiff's common-law claims, and will grant Defendants' motion to dismiss Plaintiff's CEPA and NJLAD claims against Defendant Johnson.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Facts

#### 1. Allegations in the Complaint

Plaintiff Trudy Spence-Parker is a New Jersey resident who was previously employed by the DRBA as the Authority's Chief Human Resources Officer. (Compl. ¶¶ 1, 6.) Plaintiff was hired for the Chief Human Resources Officer position on February 24, 2003, and served in that capacity at the DRBA until she tendered her resignation on March 14, 2008. (Id. at ¶¶ 6, 42.) As Chief Human Resources Officer, Plaintiff was responsible for "the development, implementation, monitoring, and enforcement of the Authority's human resources policies, procedures and practices and creating and sustaining a work environment that will make the . . . Authority an employer of choice." (Id. at ¶ 7.) In her capacity as Chief Human Resources Officer, Plaintiff reported directly to Defendant James T. Johnson, Jr., the Executive Director of the DRBA. (Id. at ¶¶ 3, 9.)

According to the allegations in the Complaint, while Plaintiff had a good working relationship with Mr. Johnson during the first two years of her employment, her relationship with Mr. Johnson began to deteriorate in May 2005. (Id. at ¶¶ 14, 17.) In May 2005, Plaintiff began to harbor concerns about the DRBA's search for a new Chief Financial Officer ("CFO") — she disapproved of the outside recruiting consultant whom the DRBA

employed during the hiring process and felt that the process was being "manipulat[ed]" – and she expressed her concerns to Mr. Johnson on multiple occasions. (<u>Id.</u> at ¶ 18.) In response to Plaintiff's criticism of the CFO search process, "Mr. Johnson disregarded and dismissed Mrs. Spence-Parker's [] concerns . . . and became increasingly critical of Mrs. Spence-Parker, acting increasingly argumentative and condescending toward her." (<u>Id.</u> at ¶ 19.)

In particular, Plaintiff alleges that Mr. Johnson engaged in the following conduct over the course of approximately three years: (1) Mr. Johnson falsely accused Plaintiff of "going over his head" to express concerns about the CFO search process to the DRBA commissioners, (<u>id.</u> at ¶ 20); (2) Mr. Johnson told Plaintiff that there were "rumors []flying around with [her] name attached to many of them," (<u>id.</u> at ¶ 22); (3) Mr. Johnson excluded Plaintiff from several meetings essential to her job duties as Chief Human Resources Officer and reassigned some of Plaintiff's job duties, (<u>id.</u> at ¶¶ 23, 38-39); (4) Mr. Johnson required Plaintiff to submit weekly updates of human resources activities when other DRBA executives did not have to submit such updates, (<u>id.</u> at ¶ 24); (5) Mr. Johnson said in Plaintiff's presence, "I know I cannot fire tenured employees, but I know how to get them – death by a thousand paper cuts," (<u>id.</u> at ¶ 25); (6) during a meeting with Plaintiff, Mr. Johnson closed the door to his office

and screamed at her for forty-five minutes, telling her that she
had mishandled the CFO search process, that she did not
understand workplace politics, and that she "was not worth the
money she was paid," (id. at ¶ 27); (7) Mr. Johnson removed
Plaintiff from a committee that she had created because he did
not want her to be the "face" of the committee, (id. at ¶ 29);
(8) Mr. Johnson's secretary intercepted Plaintiff's mail, opened
it, and did not deliver it to Plaintiff, (id. at ¶ 30); (9) Mr.
Johnson falsely accused Plaintiff of stealing from the DRBA, (id.
at ¶ 31); (10) Mr. Johnson sent "threatening emails" to Plaintiff
because she was unable to schedule a training session around his
schedule, (id. at ¶ 32); (11) Mr. Johnson refused to permit the
DRBA's Public Information Officer to release an acknowledgment
that several DRBA employees, including Plaintiff, had received a
human resources certification, (id. at ¶ 33); (12) Mr. Johnson
wrote a "letter of reprimand" to Plaintiff wrongly accusing her
of having omitted information from a draft harassment policy,
(id. at ¶ 34); (13) Mr. Johnson refused to authorize Plaintiff's
participation in a volunteering opportunity, notwithstanding the
DRBA's policy position encouraging volunteer work, (id. at ¶ 36);
(14) Mr. Johnson did not invite Plaintiff to a Delaware Chamber
of Commerce dinner, despite inviting her peers and subordinates,
(id. at ¶ 40); and (15) Mr. Johnson refused to credit Plaintiff
with an additional vacation day after she worked on a holiday.

(<u>Id.</u> at ¶ 41.)

In September 2007, Plaintiff met with the Chair and Vice-Chair of the DRBA Board of Commissioners Personnel Committee in order to express her concern over Mr. Johnson's conduct.  (<u>Id.</u> at ¶ 37.)  The Committee told Plaintiff to "keep her head down and do her job," and told her that they would follow up with her upon further review of the dispute.  (<u>Id.</u>)  Mr. Johnson's allegedly hostile conduct did not cease in the wake of her complaint to the Personnel Committee.  (<u>Id.</u>)  Finally, on March 14, 2008, allegedly as a result of Mr. Johnson's sustained hostile conduct "and upon recommendation of her physician," Plaintiff tendered her resignation to Mr. Johnson and the DRBA.  (<u>Id.</u> at ¶ 42.)

      2.   <u>Evidence Pertaining to Choice-of-Law Inquiry</u>

Defendants assert that Plaintiff was hired at the DRBA Administration Building in New Castle, Delaware.  (Walls Cert. ¶ 4.)  Plaintiff states that while she had at least one interview at the DRBA's Administration Building, her contract was negotiated over the telephone between herself in New Jersey and a third-party recruiter in Pennsylvania.  (Spence-Parker Cert. ¶ 4.)  Plaintiff further alleges that she was informed that she was hired over the telephone while she was at home in New Jersey.  (<u>Id.</u>)  Defendants maintain that Plaintiff's hiring was formalized by a resolution of the Board of Commissioners that was passed in Delaware, that the letter informing Plaintiff of her hiring

6

decision was sent from the DRBA Administration Building in Delaware, and that Plaintiff reported for her first day of work to the DRBA Administration Building in Delaware. (Walls Supp. Cert. ¶ 4.)

Plaintiff does not dispute that her sole office was located at the DRBA Administration Building in Delaware. (Walls Cert. ¶ 5; Spence-Parker Cert. ¶ 5.) Plaintiff's supervisor, Defendant Johnson, also has his primary office at the DRBA Administration and has one other satellite office in Lewes, Delaware. (Walls Cert. ¶ 6.) In addition, Defendants' evidence indicates that the DRBA's Human Resources Department, which Plaintiff supervised, is located at the DRBA Administration Building in Delaware, (id. at ¶ 10), and that Plaintiff's duties were "regularly performed" at that location. (Id. at ¶ 7.) Defendants state that Plaintiff conducted her meetings at the DRBA Administration Building in Delaware. (Id. at ¶ 14.) Plaintiff's business card identified her office as being located in Delaware and identified her office telephone number, which was a Delaware number. (Id. at ¶ 15.) At her discretion, Plaintiff also listed her Delaware office number as part of the electronic signature of her email account. (Id. at ¶ 17.) DRBA also issued Plaintiff a cellular phone which had a Delaware phone number. (Id. at ¶ 16.) In addition, Defendants provided Plaintiff with a company vehicle which was registered, serviced and insured in Delaware, and "primarily used

7

to commute to and from work in Delaware."  (Id. at ¶ 12.)

Plaintiff does not dispute that the Human Resources Department of the DRBA is located at the DRBA Administration Building in Delaware; however, Plaintiff claims that her "duties and responsibilities as CHRO of the DRBA required her to oversee the entire workforce of the DRBA, throughout both New Jersey and Delaware."  (Spence-Parker Cert. ¶ 10.)  Plaintiff alleges that she was "regularly called upon to travel throughout both New Jersey and Delaware as part of [her] job duties and responsibilities."  (Id. at ¶ 5.)  In addition, Plaintiff asserts that she "regularly worked from DRBA offices located in both New Jersey and Delaware, as well as from [her] home in New Jersey." (Id. at ¶ 6.)  According to Plaintiff, as CHRO of the DRBA, she conducted "some of [her] meetings at the DRBA Administration Building" and also "conducted some of [her] meetings at DRBA facilities in New Jersey."  (Id. at ¶ 14.)

With respect to Plaintiff's travel on DRBA business, Defendants assert that beginning in January 2005, all executive employees of the DRBA, including Plaintiff, were required to submit monthly travel reports detailing their business related travel with DRBA vehicles.  (Walls Supp. Cert. ¶ 5.)  These reports did not include any personal travel, including travel between an employee's residence and his or her primary work location.  (Id.)  According to Defendants, Plaintiff completed

8

such reports until April 2006, completing sixteen reports in total. (Id.) Plaintiff did not submit any such travel reports after April 2006. (Id.) According to Defendants, in the reports submitted by Plaintiff, she indicated forty-seven business-related trips using a DRBA-issued vehicle. (Id.) According to Defendants' evidence, twenty-four of those forty-seven trips involved travel to locations in Delaware other than Plaintiff's office at the DRBA Administration Building, sixteen trips were to locations in New Jersey, and the remainder of the trips were to destinations outside of either New Jersey or Delaware. (Id.)

According to Defendants, Plaintiff supervised twelve employees at the time her employment with the DRBA ended, including two who were located in New Jersey. (Walls Cert. ¶ 8.) Defendants assert that the two employees in New Jersey did not report directly to Plaintiff. (Id.) Certain employees that did report directly to Plaintiff, namely, the Payroll Manager, Benefits Manager, Education and Training Manager, Human Resources Manager, EEO and Recruitment Manager, and Risk Manager, were all located in Delaware. (Id. at ¶ 9.)

Plaintiff asserts that at the time of her departure from the DRBA, she "directly supervised" twelve employees. (Spence-Parker Cert. ¶ 7.) Of those twelve employees, ten were located at the DRBA Administration Building in Delaware and two were located in New Jersey. (Id. at ¶ 8.) Plaintiff certifies that all twelve

9

employees "directly reported to [her] on a regular basis," including the two Human Resources employees located in New Jersey. (Id. at ¶ 9.)  Plaintiff also asserts that she "routinely" traveled to Cape May, New Jersey, to meet with these two employees at that location.  (Id.)

While Plaintiff certifies that she "directly supervised" twelve employees, Defendants assert that Plaintiff, at the time of her departure, "directly supervised" seven employees, and that five employees were "directly supervised" by the Human Resources Manager, Andrew Ritchie.  (Walls Supp. Cert. ¶ 7.)  According to Defendants, the two human resources positions located in New Jersey were among the five employees that directly reported to the Human Resources Manager.  (Id. at ¶ 7c.)  During a six-week period between July 1, 2004, and August 23, 2004, due to a vacancy in the position of Human Resources Director (which later became the position of Human Resources Manager), Plaintiff directly supervised the five positions that normally reported directly to the Human Resources Director.  (Id. at ¶ 7b.)  Once the position of Human Resources Manager was filled by Mr. Ritchie on August 23, 2004, these positions resumed reporting directly to the Human Resources Manager, who directly reported to Plaintiff. (Id.)

Defendants certify that the two New Jersey human resources positions were that of Human Resources Generalist and Human

10

Resources Administrator.  (Id. at ¶ 9.)  According to the job
descriptions for these two positions, each position reports to
the Human Resources Manager.  (Walls Supp. Cert. Ex. C at 3-6.)
In addition, leave authorization forms for each of the New Jersey
human resources employees submitted on behalf of Defendants
indicate that the employee's supervisor was Mr. Ritchie and
contain Mr. Ritchie's signature.  (Walls Supp. Cert. Ex. B)

     Defendants certify that Delaware taxes were withheld from
Plaintiff's pay check, not New Jersey taxes.  (Walls Cert. ¶ 11.)
In addition, the DRBA-issued vehicle used by Plaintiff was
considered income to Plaintiff for which Delaware taxes were
withheld.  (Walls Supp. Cert. ¶ 10.)  Plaintiff acknowledges that
Delaware taxes were withheld from her paychecks, but certifies
that she did not pay Delaware taxes in connection with her
employment with the DRBA.  (Spence-Parker Cert. ¶ 11.)  According
to Plaintiff, the Delaware taxes withheld from her pay were
refunded each year and she instead paid New Jersey income taxes
as a New Jersey resident.  (Id.)  For her use of the DRBA-
provided company vehicle that Plaintiff used "to respond to HR-
related issues throughout New Jersey and Delaware," Plaintiff
received an annual $4,350 taxable benefit which she paid on her
New Jersey income taxes.  (Id. at ¶ 12.)

     According to Plaintiff, the DRBA Board of Commissioners and
its sub-committees "intentionally hold[] meetings in both New

11

Jersey and Delaware, typically on the third Tuesday of every
month, as per the directive of Warren Wallace, Chairman of the
Board of Commissioners from 2006-2007."   (Id. at ¶ 3.)
Defendants certify that "nearly all" meetings of the DRBA Board
of Commissioners and its sub-committees take place in Delaware.
(Walls Cert. ¶ 13.)   According to Defendants, the DRBA Board of
Commissioners has held eleven meetings as well as eleven
Commissioner committee meetings each year since 2003.   (Walls
Supp. Cert. ¶ 11.)   Defendants assert that during Plaintiff's
employment with the DRBA, "only 1-2 meetings" out of the twenty-
two meetings each year were held in New Jersey, with the
remaining twenty to twenty-one meetings taking place in Delaware.
(Id.)

     Plaintiff alleges that "the DRBA is committed to maintaining
an even balance of employees from New Jersey and Delaware."
(Spence-Parker Cert. ¶ 16.)   Also, according to Plaintiff, during
her time as CHRO, "the DRBA's executive team kept close track of
the percentages of general DRBA employees and executive board
members to ensure an even balance of New Jersey and Delaware
employees."   (Id. at ¶ 17.)   Plaintiff certifies that in order to
"ensure an even balance of New Jersey and Delaware employees,
Defendant Johnson required [Plaintiff] to prepare bi-annual
reports concerning the balance of New Jersey and Delaware DRBA
employees."   (Id. at ¶ 18.)   Plaintiff further claims that at the

time she was hired, she was told that her New Jersey residency was "a deciding factor" in her hiring.  (Id. at ¶ 19.)  In addition, Plaintiff claims, based "upon information and belief," that the DRBA required that her replacement for the CHRO position be a New Jersey resident.  (Id. at ¶ 20.)

According to Defendants, while DRBA Board members may have requested information as to the constituency of DRBA employees with respect to New Jersey or Delaware residency, "the DRBA executive team has never been requested or required to keep close track of the breakdown of the DRBA workforce between New Jersey or Delaware residency."  (Walls Supp. Cert. ¶ 13.)  While Plaintiff asserts that the DRBA required that her replacement as CHRO be a New Jersey resident, Defendants certify that the CHRO position has not been filled and that no instructions have been given by the Board of Commissioners that such replacement be a New Jersey resident.  (Id. at ¶ 14.)

Plaintiff asserts that she "tendered her resignation to the DRBA via a resignation letter [that she] drafted and sent from [her] home in New Jersey to the DRBA Administration Building in Delaware."  (Spence-Parker Cert. ¶ 15.)  Defendants certify that "when Plaintiff tendered her resignation on March 14, 2008, such resignation was tendered to the DRBA at the Administration Building in Delaware."  (Walls Cert. ¶ 18.)  According to Defendants, Plaintiff's letter of resignation had been slipped

13

under Defendant Johnson's office door and was in an envelope that was not postmarked.  (Walls Supp. Cert. ¶ 12.)

## B.   Procedural History

Plaintiff initiated this action in New Jersey Superior Court, and Defendants removed the matter to this Court pursuant to 28 U.S.C. § 1441(b) on July 23, 2008 [Docket Item 1]. Plaintiff's Complaint asserted common law claims for breach of contract and breach of the duty of good faith and fair dealing (Counts I and II, respectively), and statutory claims under the New Jersey Conscientious Employee Protection Act and the New Jersey Law Against Discrimination (Counts III and IV[1], respectively).  Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) [Docket Item 4] in lieu of an answer as to which the Court heard oral argument on February 26, 2009 and reserved decision.

In an Opinion and Order entered on March 30, 2009 [Docket Items 14 and 15], the Court granted Defendants' motion to dismiss as to Plaintiff's CEPA and NJLAD claims against the DRBA"), and denied without prejudice DRBA's motion to dismiss as to Plaintiff's common law contract claims.  Specifically, this Court concluded that (1) the CEPA and the NJLAD do not apply to the DRBA, (Docket Item 14 at 16-24); and (2) the DRBA may be subjected to suit for alleged breaches of contracts into which it

---

[1]   The Complaint mistakenly labels "Count IV" as "Count VI."

enters, (id. at 24-27); and (3) the viability of Plaintiff's
common law contract claims rests on a threshold question as to
choice-of-law, the answer to which the Court could not reach at
the motion-to-dismiss stage.  (Id. at 36-37.)  The Court
therefore denied DRBA's motion to dismiss Plaintiff's common law
claims without prejudice to DRBA's right to move for summary
judgment and to present sufficient evidence to enable the Court
to decide the choice-of-law issue.  (Id. at 37.)

Defendants filed the present motion for summary judgment
[Docket Item 18] on April 29, 2009, asserting (1) that Delaware
law applies to the instant matter and that therefore Plaintiff's
remaining common law claims cannot survive, and (2) that summary
judgment should likewise be entered as to all claims against
Defendant Johnson.

## III. DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgement as a matter of
law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, a court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving
party's evidence 'is to be believed, and all justifiable

15

inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In opposing summary judgment, a non-movant may not "rest upon mere allegations, general denials, or . . . vague statements." Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991). If the nonmovant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. Liberty Lobby, 477 U.S. at 249-50.

**B.   Choice of Law**

1.   <u>New Jersey Choice of Law Principles</u>

The Court reviewed New Jersey's choice of law principles in its prior opinion:

> The Court applies New Jersey's choice-of-law rules to
> determine whether New Jersey or Delaware substantive law
> applies to Plaintiff's contract-based claims. See Berg
> Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 462
> (3d Cir. 2006). New Jersey's choice-of-law rules for
> contract claims call for a two-step analysis. The Court

first assesses whether there is an "actual conflict" between the laws of the potentially interested states on the issue in question; if there is no divergence between the potentially applicable laws, the Court is "presented with a false conflict," Curtis T. Bedwell and Sons, Inc. v. Geppert Bros., Inc., 280 N.J. Super. 391, 395 (App. Div. 1995), and the choice-of-law "inquiry is over." Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006).

If there is an actual conflict between the two states' laws, the Court determines "which state has the most meaningful connections with and interests in the transaction and the parties." NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314, 319 (3d Cir. 1995). Although a host of factors may figure into this governmental interests analysis, id., "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state" will apply. Restatement (Second) of Conflicts § 188(3).

(Docket Item 14 at 29-30) (some citations omitted). Applying these principles, the Court concludes, first, that there is an actual conflict between New Jersey and Delaware law, and, second, that Delaware law applies to the matters at issue herein.

   2.   Actual Conflict

The Court previously concluded that an actual conflict exists between the applicable law of New Jersey and that of Delaware:

Plaintiff's common law claims are sustainable under New Jersey law, but not under Delaware law, meaning that there is an actual conflict between the states' laws. The chief argument advanced by Defendants in moving to dismiss Plaintiff's contractual claims is that Plaintiff was an at-will employee subject to termination for any reason, and so the DRBA breached no contractual obligation related to her alleged constructive discharge. In opposing Defendants' argument, Plaintiff asserts that the DRBA's Personnel Manual contained an implied promise that she would only be terminated for cause . . . . New Jersey law would recognize and enforce such an implied

17

promise from the Personnel Manual at issue in this case, but Delaware law would not.

(Id. at 30-31).

As this Court made clear, under New Jersey law, express or implied promises made in an employee manual or handbook can give rise to a cause of action for breach of contract if an employer does not honor such promises.  (Id. at 32) (citing Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284 (1985)).  The Court reviewed a line of cases following Woolley and concluded:

> [U]nder New Jersey law, in the absence of a prominent disclaimer written in straightforward terms that an employee is subject to discharge at will, an implied promise contained in an employment manual that an employee will be fired only for cause is enforceable against an employer.

(Id. at 33) (internal quotations and citations omitted).

The Court distinguished the applicable law of Delaware with that of New Jersey:

> [U]nder Delaware law, an "employer's written or oral statements to a prospective employee concerning the conditions of his employment are not enforceable against the employer without some basic contract consideration," and, unlike New Jersey law, "something more than continued employment [is required] to constitute consideration." [Mann v. Cargill Poultry, Inc., No. 88C-AU37, 1990 WL 91102, at *5 (Del. Super. Ct. June 13, 1990)], *7; compare Noye v. Hoffmann-La Roche Inc., 238 N.J. Super. 430, 432 (App. Div. 1990) ("The Woolley contract is no more than the ordinary result of an acceptance by plaintiff, by continuing to work, of the terms of employment offered by defendant's handbook"), with Heideck v. Kent General Hosp., Inc., 446 A.2d 1095, 1096 (Del. 1982) (where the handbook is "merely a unilateral statement of company policies," no contract is created).

18

> Second, in contrast with [Nicosia v. Wakefern Food
> Corporation, 136 N.J. 401, 414 (1994)], Delaware courts
> have held that an employer may foreclose a contract claim
> based on an employee handbook simply by including a
> disclaimer stating that the handbook "do[es] not create
> . . . an employment agreement." Bunting v. Citizens
> Financial Group, Inc., No. 03-013, 2006 WL 1067321, at *4
> (Del. Super.  Ct. Apr. 13, 2006); see also Brooks v.
> Fiore, No. 00-803, 2001 WL 1218448, at *4 (D. Del. Oct.
> 11, 2001) (language providing that the "handbook . . .
> [does not] create or constitute an employment contract"
> is sufficient to foreclose implied contract claim).  That
> is, while New Jersey courts consider terms such as "not
> contractual" to be "confusing legalese" insufficient to
> defeat a Woolley claim, Nicosia, 136 N.J. at 414,
> Delaware courts find precisely the same language to
> constitute an effective disclaimer. See Bunting, 2006 WL
> 1067321, at *4; Brooks, 2001 WL 1218448, at *4.

(Docket Item 14 at 33-35.)  The Court therefore concluded that an

actual conflict exists between the applicable laws of New Jersey

and Delaware.  (Id.)  The parties have not disputed this

conclusion in the motion presently under consideration.

     3.   States' Interest Analysis

     In light of its conclusion that an actual conflict exists

between the laws of New Jersey and the laws of Delaware with

respect to Plaintiff's claim of breach of contract based on the

DRBA employment manual, the Court must apply New Jersey's choice-

of-law rules to determine "which state has the most meaningful

connections with and interests in the transaction and the

parties." NL Industries, Inc. v. Commercial Union Ins. Co., 65

F.3d 314, 319 (3d Cir. 1995).  In making this determination, the

Court looks to the  "enumeration of contacts" indicated in the

Restatement (Second) of Conflicts § 188 "to guide the

identification of the state with the most significant relationship" to the transaction. Id. at 320. Specifically, the Court considers (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflicts § 188(2).

These contacts "are to be evaluated according to their relative importance with respect to the particular issue." Id. As the following discussion makes clear, the Court finds that the most important contact at issue in this matter – the place of performance – weighs strongly in favor of the application of Delaware law, while the remaining factors are of less importance and are largely in equipoise. The Court accordingly concludes that Delaware law applies to Plaintiff's contract-based claims.

    a.   Place of Performance and the Location of the Subject Matter of the Contract

The Court first addresses the place of performance of Plaintiff's employment contract, which, of all of the state-contact considerations, demonstrates most forcefully why Delaware law applies to Plaintiff's common law claims.[2] Plaintiff's sole

_____

[2] With respect to "the location of the subject matter of the contract," the Court notes that the subject matter of the contract was not a physical thing but was instead Plaintiff's employment with the DRBA. As such, this factor overlaps with

20

office was located at the DRBA Administration Building in
Delaware, (Walls Cert. ¶ 5; Spence-Parker Cert. ¶ 5.), as is the
DRBA's human resources department, which Plaintiff supervised.
(Walls Cert. ¶ 10.)  Plaintiff identified the location of her
office at the DRBA Administration Building in Delaware both on
her business cards and in her email signature.  (Id. at ¶¶ 15,
17.)  Defendant Johnson, Plaintiff's supervisor, also maintained
his offices in Delaware.  (Id. at ¶ 6.)  In connection with
Plaintiff's employment, the subject matter of the alleged
contract, Plaintiff used a DRBA-provided cell phone with a
Delaware telephone number, (id. at ¶ 16), and drove a DRBA-
provided vehicle which was registered, serviced and insured in
Delaware.  (Id. at ¶ 12.)  During Plaintiff's employment with the
DRBA, Delaware state taxes were withheld from Plaintiff's
paycheck, although she paid New Jersey state taxes due to her
residency.  (Id. at ¶ 11.)

Plaintiff does not dispute any of the facts detailed above.
Instead, Plaintiff points out that certain aspects of the
performance of her job took place in New Jersey.  Plaintiff
asserts that although her sole office was located in Delaware,
Plaintiff "regularly" traveled between Delaware and New Jersey on
business and "regularly" worked from DRBA offices as well as her

---

"the place of performance," and the Court considers the two
factors together.

home in New Jersey.  (Spence-Parker Cert. ¶¶ 5, 6.)  Plaintiff
further asserts that she held "some" of her meetings as CHRO at
the DRBA Administration building, and also held "some" meetings
at locations in New Jersey.  (Id. at ¶ 14.)  In addition,
Plaintiff certifies that her duties as CHRO "required her to
oversee the entire workforce of the DRBA, throughout both New
Jersey and Delaware."[3]  (Id. at ¶ 10.)

     Weighing these facts, the Court concludes that the place of
performance consideration tips decidedly in favor of the
application of Delaware law.  Even viewing the record in the
light most favorable to Plaintiff, it is apparent that the
primary place of performance of Plaintiff's job duties was in
Delaware; Plaintiff's evidence at most shows that the performance
was not exclusively in Delaware, in that she attended "some"
meetings in New Jersey, (Spence-Parker Cert. ¶ 14), and
"regularly" left her primary site of employment to attend to
matters in New Jersey.  (Id. at ¶¶ 5-6.)  Even accounting for
this evidence showing that Plaintiff's performance of her
employment duties at times brought her to New Jersey, the

---

     [3] Plaintiff also asserts that while Delaware taxes may have
been withheld from her paycheck, such withholdings were refunded
at the end of the year and she instead paid New Jersey taxes
rather than Delaware taxes.  (Spence-Parker Cert. ¶ 11.)  In
addition, Plaintiff received a $4,350 taxable benefit for her use
of the DRBA-provided vehicle which she paid on her New Jersey
income taxes.  (Id. at ¶ 12.)  Of course, the state where Ms.
Spence-Parker paid her taxes is indicative of her personal
residency and not her place of job performance.

principal place of performance was Delaware: Plaintiff's only office was in Delaware (as is evidenced by Plaintiff's business card and email signature) and the department Plaintiff headed was based out of the Delaware office, as were most of the employees she supervised, the administrators to whom she was subordinate, and the majority of the out-of-office trips she made.

Significantly, Plaintiff's own allegations in the Complaint concerning the activities underlying her common law claims also indicate that the most significant aspects of the conduct that forms the basis of her claims took place in Delaware, not New Jersey.[4]

Taking account of the evidence adduced by the parties concerning the place of performance and the location of the subject matter of the contract, the Court concludes that these contacts weigh in favor of applying Delaware law to Plaintiff's contract-based claims. While Plaintiff's evidence shows that in

_____

[4] Plaintiff alleges that Defendant Johnson closed the door to his office during a meeting with Plaintiff and screamed at her for forty-five minutes, telling her that she had mishandled the CFO search process, that she did not understand workplace politics, and that she "was not worth the money she was paid." (Compl. ¶ 27.) According to Plaintiff, Mr. Johnson's secretary intercepted Plaintiff's mail, opened it, and did not deliver it to Plaintiff. (Id. at ¶ 30.) In addition, Plaintiff alleges that Mr. Johnson did not invite her to a Delaware Chamber of Commerce dinner, despite inviting her peers and subordinates. (Id. at ¶ 40.) In short, the very conduct that underlies Plaintiff's constructive discharge theory in this lawsuit largely took place in the DRBA Administration Building, which, as all parties concede, is located in Delaware.

performing her duties at DRBA, she was not restricted to working out of her Delaware-based office, the state with "the most meaningful connections with" Plaintiff's employment contract is Delaware. NL Industries, 65 F.3d at 319.

> b.   Place of Contracting

As the Court now explains, it finds that the remaining state-interest factors are largely in equipoise, and that these considerations bear less forcefully upon the choice-of-law determination than does the place of performance. Of the remaining factors, the Court looks first to the place of contracting.

The place of contracting is "the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect." Restatement (Second) of Conflicts § 188, Comment e. Under New Jersey law, "[a] contract is made at the place where the final act necessary for its formation is done." Filson v. Bell Tel. Laboratories, Inc., 82 N.J. Super. 185, 190 (App. Div. 1964) (internal citation omitted). Neither party has submitted evidence that allows for a clear determination of "where the final act necessary" for the formation of Plaintiff's employment agreement took place. Defendants allege that Plaintiff was hired in Delaware by a resolution of the Board of Commissioners that was passed in Delaware, and that the letter informing Plaintiff of her hiring

decision was sent from the DRBA Administration Building in
Delaware.  (Walls Supp. Cert. ¶ 4.)  Plaintiff alleges that while
she did attend an interview in Delaware, she was informed by the
DRBA that she was "hired" over the telephone while she was at
home in New Jersey.  (Spence-Parker Cert. ¶ 4.)  No evidence in
the record, however, indicates the place or time that an
agreement for employment was reached between the parties.

    The commentary to the § 188 of the Restatement addresses the
weight of the place of contracting among the factors relevant to
the choice of law analysis:

> Standing alone, the place of contracting is a relatively
> insignificant contact. To be sure, in the absence of an
> effective choice of law by the parties, issues involving
> the validity of a contract will, in perhaps the majority
> of situations, be determined in accordance with the local
> law of the state of contracting. In such situations,
> however, this state will be the state of the applicable
> law for reasons underlined additional to the fact that it happens to
> be the place where occurred the last act necessary to
> give the contract binding effect. The place of
> contracting, in other words, rarely stands alone and,
> almost invariably, is but one of several contacts in the
> state.

Restatement (Second) of Conflicts § 188, Comment e (emphasis
added).  In light of the fact that the evidence is indeterminate
on the matter of the place of contracting, and given that this
factor is "a relatively insignificant contact," the Court
concludes that the place of contracting adds little to the
Court's choice-of-law determination as to Plaintiff's contract
claims.

c.   <u>Place of Negotiation of the Contract</u>

The same is true for the next choice-of-law determination, the place where the contract was negotiated.  While the place of negotiation may be "a significant contact" in determining which state has the most significant relationship to the transaction and the parties, it "is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone."  Restatement (Second) of Conflicts § 188, Comment e.  <u>See</u>, <u>e.g.</u>, <u>Schley v. Microsoft Corp.</u>, No. 08-3589, 2008 WL 5075266, at *9 (D.N.J. Nov. 24, 2008) (finding that "the place of negotiation is immaterial because negotiations were conducted over the phone and through email in both New Jersey and Washington").  This is especially true in the instant matter, as one of the states from which negotiations were conducted is otherwise unrelated to the action (<u>i.e.</u>, Pennsylvania).  In light of the fact that the negotiations that gave rise to the contract at issue in this case occurred remotely over telephone from different states and that there is thus "no one single place of negotiation and agreement," Restatement (Second) of Conflicts § 188, Comment e, the Court concludes that this factor "is immaterial" to the choice-of-law consideration at issue herein.  <u>Schley</u>, 2008 WL 5075266, at *9.

26

      d.   <u>Domicile, Residence, Place of Incorporation</u>
            <u>and Place of Business of the Parties</u>

As the Court noted in its earlier opinion, Plaintiff is a New Jersey resident, (Compl. ¶ 1), and the DRBA is "an agency of government of the State of Delaware and the State of New Jersey." N.J.S.A. 32:11E-1 at Art. IV.  The Court further noted – and the record now supports – that the DRBA's principal office, <u>i.e.</u>, the DRBA Administration Building, is located in Delaware.  (Walls Cert. ¶ 4.)

The Court concludes that "the residency of the parties is not determinative" under the circumstances presented here. <u>Schley</u>, 2008 WL 5075266, at *9.  As the Restatement (Second) of Conflicts makes clear:

> [The] significance [of these considerations] depends largely upon the issue involved and upon the extent to which they are grouped with other contacts . . . . The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business.

Restatement (Second) of Conflicts § 188, Comment e.  The significance of Plaintiff's residency in New Jersey is diminished as a result of the fact that, as recognized <u>supra</u>, the primary performance of the parties' contract took place in Delaware.  <u>See id.</u>  And given that the DRBA is an agency of both states, with its principal office in Delaware, the residency of the DRBA does not militate in favor of the application of either state's law.

In light of these considerations, the Court cannot conclude that the residency or domicile of the parties is a significant consideration for choice-of-law purposes in this case.  See Schley, 2008 WL 5075266, at *9.

    4.   Choice of Law

Evaluation of the above factors leads to the conclusion that Delaware law, rather than New Jersey law, applies to Plaintiff's contract-based claims.  Even giving full credit to Plaintiff's assertions with respect to her employment with the DRBA, the evidence simply does not suggest that New Jersey had "the most meaningful connections with and interests in the transaction and the parties."  N.L. Industries, 65 F.3d at 319 (emphasis added).  Plaintiff was employed by an agency with its principal place of business in Delaware and her job duties were primarily based in Delaware; that is, the performance of the employment contract at issue herein took place primarily in Delaware, and secondarily in New Jersey.  In addition, many of the allegations which serve as elements of Plaintiff's contract claim took place in or centered around Delaware.  Finding that considerations of the place of performance reflect the strongest state contacts to the contract in this case, and that such performance occurred primarily in Delaware, and that the employer is likewise primarily centered in Delaware, the Court concludes that Delaware has the most meaningful connections with the facts underlying Plaintiff's

contract-based claims, and that Delaware law thus applies to the common law claims in this suit.  See id.

Finding that Delaware law applies to Plaintiff's common law contract claims, the Court will grant Defendants' motion for summary judgment as to these claims.  As the Court explained in its prior opinion, under Delaware law, Plaintiff's contract-based claims are unsustainable for two reasons:

> (1) the DRBA's manual is "merely a unilateral statement of company policies," Heideck, 446 A.2d at 1096, unsupported by consideration consisting of something "more than continued employment," Mann, 1990 WL 91102, at *7; and (2) the disclaimer in the Personnel Manual that it is "not a contract, and nothing in this booklet is intended or shall be deemed to vest any right in any employee of the Authority" is sufficient as a matter of law in Delaware to defeat Plaintiffs' claim.

(Docket Item 14 at 35) (some internal citations omitted). Plaintiff does not challenge these conclusions concerning the conflict between New Jersey's and Delaware's laws, and does not suggest that her claims are cognizable under Delaware law. Because Plaintiff's contract-based claims are unsustainable under Delaware law, and because the Court concludes that Delaware law applies to the claims at issue in this case, the Court will grant Defendants' motion for summary judgment as to Plaintiff's contract-based claims in Counts I and II of the Complaint.

### C.    CEPA Claim Against Defendant Johnson

The Court next addresses Defendants' motion seeking dismissal of Plaintiff's CEPA claim against Defendant Johnson.

29

For the reasons that follow, the Court will grant Defendants' motion to dismiss Plaintiff's CEPA claim.

New Jersey's CEPA was enacted in 1986 "to provide broad protections against employer retaliation for workers whose whistle-blowing actions benefit the health, safety and welfare of the public." Feldman v. Hunterdon Radiological Associates, 187 N.J. 228, 239 (2006) (internal quotations and citations omitted).

> To succeed in a CEPA claim a plaintiff must prove four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action.

Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 468 (D.N.J. 2009) (citation omitted).

With regard to the first of these elements, the language of the statute itself provides the scope of employer activity that may reasonably be considered the subject of an employee's whistle-blowing activity. The employee must reasonably believe that the practice in question:

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

> (2) is fraudulent or criminal; or

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3(c).  Plaintiff does not allege that her employer engaged in any illegal or fraudulent activity, and appears to focus on the third prong's consideration of a "clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."  Id.

As to this prong, the New Jersey Supreme Court has made clear that "the determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law," Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187 (1998), and that the requirement that the mandate of public policy be "clear" cannot be overlooked:

> A basic requirement of the wrongful discharge cause of action is that the mandate of public policy be clearly identified and firmly grounded.  A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate . . . .
>
> We look generally to the federal and state constitutions, statutes, administrative rules and decisions, judicial decisions, and professional codes of ethics to inform our determination whether specific corrupt, illegal, fraudulent or harmful activity violates a clear mandate of public policy, but those sources are not necessarily exclusive.  A salutary limiting principle is that the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee.

Id. at 181, 188 (citations omitted).

"In order for a plaintiff to meet the threshold to withstand summary judgment under N.J.S.A. 34:19-3c, he or she must 'furnish the trial court with enough by way of proof and legal basis to enable the court to determine as a matter of law' that the

plaintiff has identified 'the asserted violation with adequate particularity' for a jury's consideration." Blizzard v. Exel Logistics North America, Inc., No. 02-4722, 2005 WL 3078175, at *7 (D.N.J. Nov. 15, 2005) (quoting McLelland v. Moore, 343 N.J. Super. 589, 601 (App. Div. 2001)). "The trial court can and should enter judgment for a defendant when no such law or policy is forthcoming." Dzwonar v. McDevitt, 177 N.J. 451, 463 (2003).

In their motion, Defendants argue that Plaintiff has failed to suggest that the DRBA took action "incompatible with a clear mandate of public policy" to which Plaintiff objected, N.J.S.A. 34:19-3(c)(3), and, in response to Defendants' motion, Plaintiff has not explained with "adequate particularity" how such a clear mandate of public policy was implicated by the circumstances underlying her Complaint, Blizzard, 2005 WL 3078175, at *7; indeed, Plaintiff has not opposed Defendants' motion seeking dismissal of the CEPA claim against Defendant Johnson whatsoever. The only reference in the Complaint to anything that verges on an "offensive activity . . . pos[ing] a threat of public harm," Mehlman, 153 N.J. at 188, is Plaintiff's allegation that she "perceived flaws" with the DRBA's search for a CFO and believed that there was unspecified "manipulation of the hiring process." (Compl. ¶ 18.) But in the absence of an articulated basis in opposition to Defendants' dismissal motion for connecting the employer's activity to a threat to "public health, safety or

welfare," N.J.S.A. 34:19-3(c)(3), nonspecific "flaws" or "manipulation" in a hiring decision are insufficient to establish that the DRBA took action "incompatible with a clear mandate of public policy," N.J.S.A. 34:19-3(c)(3), and "pos[ing] a threat of public harm," Mehlman, 153 N.J. at 188; cf. Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 94 n.4 (3d Cir. 1999) (employee complaints concerning "internal disputes over funding and staffing" insufficient to ground a CEPA claim if unrelated to public safety or welfare).

Plaintiff having failed to "furnish the trial court with enough by way of proof and legal basis," Blizzard, 2005 WL 3078175, at *7 (citation omitted), to tie her perception of a flaw in the DRBA's hiring process to a threat to "public health, safety or welfare," N.J.S.A. 34:19-3(c)(3), the Court will grant Defendants' motion to dismiss Plaintiff's CEPA claim.

### D.   NJLAD Claim as to Defendant Johnson

Finally, the Court addresses Defendants' argument that Plaintiff has failed to allege sufficient facts to state a cognizable claim under the NJLAD.  To state a claim for wrongful termination (including a claim of constructive discharge) under the NJLAD, a plaintiff must allege "that he or she: (1) belongs to a protected class, (2) was qualified for the position held, (3) was terminated despite adequate qualifications, and (4) [that the circumstances surrounding the discharge] permit an inference

33

of . . . discrimination."  Bentley v. Millennium Healthcare
Centers II, LLC, No. 06-5939, 2009 WL 211653, at *5 n.2 (D.N.J.
Jan. 21, 2009) (quoting Monaco v. Am. Gen. Assurance Co., 359
F.3d 296, 301 (3d Cir. 2004)) (internal quotations omitted).

     A plaintiff claiming to have been wrongly discriminated
against in violation of the NJLAD must identify the protected
class that forms the basis of her discrimination claim; where it
"not apparent whether Plaintiffs allege that they were terminated
on the basis of race, gender, age, or a different protected
class," dismissal of an NJLAD claim with leave to file a
factually supported pleading is appropriate.  Cheeseman v. Baxter
Healthcare Corp., 08-4814, 2009 WL 1351676, at *4 (D.N.J. May 12,
2009) (internal quotations and citations omitted).  Plaintiff's
Complaint is silent as to the "protected class" that formed the
basis of Defendant Johnson's alleged discrimination against her,
meaning that her pleadings contain insufficient factual
allegations to "permit an inference of . . . discrimination."
Bentley, 2009 WL 211653, at *5 n.2 (citation omitted); Cheeseman,
2009 WL 1351676, at *4.  The Court will accordingly grant
Defendants' motion to dismiss Plaintiff's NJLAD claim against
Defendant Johnson.  Should Plaintiff seek to assert such a claim
with sufficient specificity, she must file a motion seeking leave
to file an amended complaint that corrects the deficiencies
identified herein with respect to her NJLAD claim within ten (10)

34

days of the entry of the Order accompanying this decision.

## IV.   CONCLUSION

For the reasons set forth above, the Court will grant Defendants' motion for summary judgment as to Plaintiff's contract-based claims in Counts I and II, as well as Defendants' motion for summary judgment as to Plaintiff's CEPA claim against Defendant Johnson.  The Court will dismiss Plaintiff's NJLAD claim against Defendant Johnson without prejudice to Plaintiff's right to file a motion for leave to file an amended complaint upon her NJLAD claim that corrects the deficiencies identified in this Opinion within ten (10) days of the entry of the accompanying Order.  The accompanying Order is entered.

**August 21, 2009**                     **  s/ Jerome B. Simandle     **
Date                                                JEROME B. SIMANDLE
                                                    United States District Judge